IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN PAUL SZYMKOWICZ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number 19-3329 (BAH) |
| vs. | ) | |
| | ) | Chief Judge Beryl A. Howell |
| MICHAEL STUART FRISCH | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF JOHN PAUL SZYMKOWICZ'S MEMORANDUM IN OPPOSITION TO
DEFENDANT MICHAEL STUART FRISCH'S
MOTION TO DISMISS PURSUANT TO F. R. CIV. P. 12 AND
<u>SPECIAL MOTION TO DISMISS PURSUANT TO THE D.C. ANTI-SLAPP ACT</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS……………………...………………………………………………i

TABLE OF AUTHORITIES………………………………………………...………iv

INTRODUCTION…………………………………………………………...………1

STATEMENT OF FACTS……………………………………………………..3

    A.    The Parties……………………………………………………....3

    B.    The Disciplinary Proceedings Involving Plaintiff Szymkowicz……………........3

        1.    The Underlying Litigation involving Genevieve Ackerman……………......3

        2.    The Bar Complaint and Investigation……………………………...……4

    C.    Professor Frisch's Blog Posts…………………………………........5

    D.    Procedural History of this Civil Action……………………………….....6

ARGUMENT………………………………………………………………...6

I.    PLAINTIFF SZYMKOWICZ'S COMPLAINT STATES A CLAIM FOR
DEFAMATION………………………………………………………….....6

    A.    Throughout history, the common law has afforded a cause of action for damage to a person's reputation by the publication of defamatory statements……………….6

    B.    Plaintiff Szymkowicz is not a "public figure"……………………………….7

        1.    The disciplinary proceeding involving Plaintiff Szymkowicz was not a "public controversy"…..………………………………………….....9

        2.    Plaintiff did not play a "significant role" in the disciplinary proceedings into which he was involuntarily brought………………………...11

        3.    Professor Frisch's defamatory statements were not "germane" to the Plaintiff 's involvement in the disciplinary proceedings……………...…11

    C.    As a private individual, Plaintiff only needs to prove that Professor Frisch published his defamatory statements with negligence in order to state a cause of action upon which relief may be granted………………..……………….....12

i

D.     Plaintiff was the "subject of a false and defamatory statement"……..……..…12

1.     Professor Frisch's statements that accused Plaintiff of legal "misconduct," "elder care abuse,' and "horrific elder abuse" were defamatory *per se*….12

E.     Professor Frisch's defamatory statements were not "unactionable opinions" since they capable of "objective verification," *i.e.*, can be proven true or false……….13

F.     Professor Frisch's defamatory statements were not a "supportable interpretation" of the findings of the Hearing Committee, the Board on Professional Responsibility or the Court of Appeals during the disciplinary proceedings involving Plaintiff Szymkowicz…………………….....…………………………17

G.     Professor Frisch's defamatory statements do not fall under the "fair comment" privilege……………………………………………………………………….18

H.     Professor Frisch's defamatory statements do not fall under the "fair report" privilege……………………………………………………………….……19

I.     Professor Frisch acted with "actual malice" and "reckless disregard for the truth"……………………………………………………………………...…19

J.     The complaint states claims for defamation upon which relief may be granted, and therefore, the case should survive dismissal………………………….……23

II.     THE COMPLAINT STATES A CLAIM FOR FALSE LIGHT…………………....24

III.     THE COMPLAINT STATES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS………………………………………….……………...25

IV.     THE COURT HAS SUBJECT MATTER JURISDICTION …………..…………....26

V.     IT IS SETTLED THAT THE D.C. ANTI-SLAPP ACT DOES NOT APPLY IN THIS COURT……………………………...………………………………………....29

A.     The *Abbas* and *Mann* Cases…………………………………………...…29

B.     After *Abbas* and *Mann*, the District Court for the District of Columbia has made clear on multiple occasions that the D.C. Anti-SLAPP Act does not apply in federal courts whose jurisdiction is based upon diversity of citizenship……...…30

1.     *Deripaska v. Associated Press*, Civil Action No. 17-00913 (D. D.C. Docket No. 16, October 17, 2017………………………………...……31

2. *Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D. D.C. May 16, 2018), *subsequently dismissed in Libre v. Nexus v. Buzzfeed, Inc.*, 2018 U.S. Dist. LEXIS 210003 (December 13, 2018) …………...……...……32

3. *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158…33

4. *Arpaio v. Zucker*, 2019 U.S. Dist. LEXIS 189291 (D. D.C. October 31, 2019)……………………..…………………………………………33

C. This Court should deny Professor Frisch's motion to dismiss pursuant to the D.C. Anti-SLAPP Act………………………………………………………………33

D. Even if this Court holds that the D.C. Anti-SLAPP Act applies in this case, Plaintiff Szymkowicz has alleged claims that are "likely to succeed on the merits," and therefore, should not be dismissed………………………………………………...…………………34

CONCLUSION………………………………………………………………...……34

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2014)……………..29, 30, 32, 33

*ABLV Bank, AS v. Center for Advanced Defense Studies Inc.*, 2015 U.S. Dist. LEXIS 181218
(E.D. Va. April 21, 2015)…………………………………………………………………33, 34

*Ackerman v. Abbott*, 978 A.2d 1250 (D.C. 2009)……………………………………………………3

*Akmetshin v. Browder*, 2019 U.S. Dist. LEXIS 157802 (D. D.C. September 16, 2019)…….30, 31

*Arpaio v. Zucker*, 2019 U.S. Dist. LEXIS 189291 (D. D.C. October 31, 2019)……………31, 33

*Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018)…………………………………..…………34

*Cianci v. New Times Publishing Co.*, 639 F. 2d 54 (2nd Cir. 1980)……………………………...14

*Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158
(D. D.C. July 3, 2018)…………………………………………………………………...……30, 33

*Competitive Enterprise Institute v. Mann*, 150 A. 3d 1213 (D.C. 2016)……………....…..*passim*

*Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109 (D. D.C.
January 4, 2018)…………………………….…………………………………………………30

*Deripaska v. Associated Press*, Civil Action No. 17-00913 (D. D.C. Docket No. 16,
October 17, 2017)…………………………………………………………………………30, 31

*Easaw v. Newport*, 253 F. Supp. 3d 22 (D. D.C. May 12, 2017)………………………...…32

*El-Hadad v. Embassy of the United Arab Emirates*, 2006 U.S. Dist. LEXIS 21491
(D. D.C. 2006)………………………………………………………………...…….…26, 27

*Erie v. Tompkins*, 304 U.S. 64 (1938)…………………………………………………………31

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D. D.C. June 6, 2018)………………………...…30

*Fisher v. Washington Post Co.*, 212 A.2d 335 (D.C. 1965)……………………………...…18

*Freeman Holdings of Arizona, L.L.C. v. Doe*, 2013 U.S. Dist. LEXIS 8038
(D. Az. 2013)………………………………………………………………………...…28, 29

*Fridman v. Bean LLC*, 2019 U.S. Dist. LEXIS 7874 (D. D.C. January 15, 2019)………………30

*In re Gawker Media L.L.C.*, 571 B.R. 612 (Bankr. S.D. N.Y. 2017)……………………………30

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)……………………………....………7, 27, 29

*Grossman v. Goemans*, 631 F. Supp 972 (D. D.C. 1986)……………………………………12, 27

*Herbert v. Lando*, 441 U.S. 153 (1979)…………………………………………………….……23

*Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026 (N.D. Ill. 2013) *affirmed by Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015)…………………34

*Jankovic v. International Crisis Group*, 593 F. 3d 22 (D.C. Cir. 2010)…………………………16

*Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017)………...……9, 10, 11, 12

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019), *as revised* (Aug. 29, 2019)……………………34

*Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D. D.C. May 16, 2018), *subsequently dismissed in Libre v. Nexus v. Buzzfeed, Inc.*, 2018 U.S. Dist. LEXIS 210003 (December 13, 2018)……………………………………………………………………...…30, 32

*Los Lobos Renewable Power, L.L.C. v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018)….....34

*Luvin v. Kunin*, 17 P. 3d 422 (Nev. 2001)……………………………………………….………19

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)…………………………………...…*passim*

*Moldea v. New York Times Co.*, 22 F. 3d 310 (D.C. Cir. 1994)…………………..………...…17

*Nader v. de Toledano*, 408 A.2d 31 (D.C. 1979)…………………………………………...21

*Oao Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D. D.C. 2005)……...………19

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980)……………………..……12

*Planned Parenthood Federation of America v. Center for Medical Progress*, 890 F.3d 828 (9th Cir. 2018)……………………………………………………………….34

*Platinum Press, Inc. v. Douros-Hawk*, 2018 U.S. Dist. LEXIS 206655 (W.D. N.C. December 7, 2018)……………………………………………34

*Robertson v. McCloskey*, 680 F. Supp. 414 (D. D.C. 1988)………………..………………26

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938)…………………………29

*Sims v. Sunovion Pharmaceuticals, Inc.*, 2019 U.S. Dist. LEXIS 25802
(D. D.C. 2019)……………………………………………….……..23, 24, 25, 26, 28

*Smith v. Clinton*, 253 F. Supp. 3d 222 (D. D.C. 2017)………………………………..…24

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018)………………………………….......24

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987)…………………………..…………………...13

*Time, Inc. v. Firestone*, 457 U.S. 448 (1976)…………………………………………...…9

*Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537 (D. Minn. 2015)……………..…34

*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)…………………10

*Wolston v. Reader's Digest Association*, 443 U.S. 157 (1979) …………………..…………8, 9

*Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081 (9th Cir. 2004)……..…34

## Statutes

D.C. Anti-SLAPP Act, D.C. Code § 16-5501, *et seq*……………………………….…………*passim*

D.C. Code § 22-931, *et seq*., entitled the "Criminal Abuse, Neglect, and Financial Exploitation of Vulnerable Adults and the Elderly Act of 2000"…………………………………....…*passim*

## Court Rules

F. R. Civ. P. 12 (b) (6)……………………………………………………………*passim*

## Disciplinary Proceedings

Hearing Committee Report dated September 28, 2012…………………………………..…*passim*

Board on Professional Responsibility Report dated July 25, 2014…………………….……*passim*

Board on Professional Responsibility Report dated May 17, 2017…………………………*passim*

Court of Appeals Opinion dated September 17, 2015……………………………………*passim*

Court of Appeals Opinion dated November 8, 2018……………………………..…*passim*

## INTRODUCTION

This is a defamation case, and the issues are straight forward.  The Plaintiff, J.P. Szymkowicz, practices law in the District of Columbia in a two person law firm with his father, John T. Szymkowicz.  The Defendant, Michael Stuart Frisch, is a former prosecutor in the D.C. Office of Disciplinary Counsel, and currently is an adjunct professor at the Georgetown University Law Center, where he teaches legal ethics.  Professor Frisch publishes a blog entitled the "Legal Profession Blog" that highlights cases involving legal ethics.  In a series of blog posts that reported on disciplinary proceedings involving the Szymkowiczes' representation of an elderly woman and her son, Professor Frisch alleged that Plaintiff Szymkowicz engaged in professional misconduct and committed the crime of elder abuse.  Professor Frisch published these assertions as facts, knowing that Plaintiff Szymkowicz has been repeatedly exonerated by the Hearing Committee, the Board on Professional Responsibility and the Court of Appeals in reports and opinions that found no elder abuse, no fraud, no misconduct, no deceit, no misrepresentation.

In his motions to dismiss, Professor Frisch never denies that he has accused Plaintiff Szymkowicz of professional misconduct or crimes and does not claim that his allegations are true—he does not deny the falsity of his allegations.  Rather, he argues that his allegations are opinions, and therefore, immune from liability.  Professor Frisch offers no factual justifications to support his statements and assiduously avoids addressing the seminal cases on opinion in the context of defamation actions (*Milkovich* and *Mann*) that make it absolutely clear that speech is not opinion if it asserts a verifiable fact.  Rather, Professor Frisch discusses the law prior to *Milkovich* and *Mann* that has long been overtaken on the issue of opinion.

1

On the issue of fair comment, Professor Frisch ignores the relevant standards:  the report must be accurate or a fair abridgment of the occurrence reported in order to protect the author in a defamation action.  In addition, the author must attribute the statement to the official proceeding from which it is quoted.  An unattributed statement which does not accurately convey information about what transpired in the proceeding is not privileged.  The disciplinary proceedings involving Plaintiff Szymkowicz did not even mention the crime of elder abuse, but instead, centered on whether the elderly woman provided informed consent to Plaintiff Szymkowicz's representation of both the woman and her son.  No tribunal made any findings whatsoever on any charge of elder abuse – because the prosecutor did not charge the Szymkowiczes with elder abuse.  Professor Frisch's false allegations are clearly unprotected by the fair comment defense.

Additionally, this defense does not apply if the defendant acted with actual malice.  Here, Julia Porter, who prosecuted the disciplinary charges against the Szymkowiczes, is Professor Frisch's friend and colleague.  Professor Frisch admits that he is "biased" in her favor.  When Ms. Porter failed in her mission, and was harshly criticized by the panel. Professor Frisch took up the cudgel.  Under *Mann*, evidence of bias and agenda are evidence of malice.

Plaintiff Szymkowicz's complaint against Professor Frisch includes claims for defamation, false light and intentional infliction of emotional distress.  Professor Frisch filed a motion to dismiss pursuant to F. R. Civ. P. 12 (b) (6) and a special motion to dismiss pursuant to the D.C. Anti-SLAPP Act.  As in any defamation case, the issues are limited:  are Professor Frisch's statements true or false; did he publish a defamatory allegation of fact concerning Plaintiff Szymkowicz; and did he act with the requisite degree of fault.  In this opposition,

Plaintiff Szymkowicz responds to both of these motions and sets forth facts and arguments that defeat them.

**STATEMENT OF FACTS**[1]

**A.     The Parties**

The Plaintiff, J.P. Szymkowicz, practices law in the District of Columbia in a two person law firm with his father, John T. Szymkowicz.  The Defendant, Michael Stuart Frisch, is a former prosecutor in the D.C. Office of Disciplinary Counsel, who currently is an adjunct professor at the Georgetown University Law Center where he teaches legal ethics.  Professor Frisch publishes a blog entitled the "Legal Profession Blog" that highlights cases involving legal ethics.  On January 3, 2020, Plaintiff Szymkowicz voluntarily dismissed Law Professor Blogs, LLC pursuant to a settlement agreement after it removed all blog posts that mention the Szymkowiczes.  [Docket #11].

**B.     The Disciplinary Proceedings Involving Plaintiff Szymkowicz**

**1.     The Underlying Litigation involving Genevieve Ackerman**

From 2005 to 2007, the Szymkowiczes represented an elderly woman named Genevieve Ackerman and her son, Dr. Stephen Ackerman, Jr., in litigation that involved a trust established for Mrs. Ackerman's benefit.  It is important to note that Plaintiff Szymkowicz "[n]ever spoke to Mrs. Ackerman," and, although he "appeared on behalf of Mrs. Ackerman in the litigation, his role was entirely secondary to his father's."  *See* Board on Professional Responsibility's 1st Report dated July 25, 2014 at 26-27.  In *Ackerman v. Abbott*, 978 A.2d 1250 (D.C. 2009), the

---

[1]     Professor Frisch requests that the Court take judicial notice of "all records of disciplinary proceedings involving the Szymkowiczes and filings therein, as well as the content of all six blog posts written by Professor Frisch about the proceedings."  *See* Docket #13-1, p. 3, n.4.  Plaintiff agrees that the Court should take judicial notices of these documents.

D.C. Court of Appeals summarized the facts surrounding the Szymkowiczes' representation of

Mrs. Ackerman, which became the subject of disciplinary proceedings before the Board on

Professional Responsibility.

### 2.    The Bar Complaint and Investigation

Mrs. Ackerman's daughter, Mary Frances Abbott, filed "bar complaints" against the

Szymkowiczes that led to disciplinary charges brought by the Office of Disciplinary Counsel and

prosecuted by Professor Frisch's friend and colleague, Deputy Disciplinary Counsel Julia Porter.

At trial before a Hearing Committee of the D.C. Board on Professional Responsibility, Ms.

Porter alleged that the Szymkowiczes violated Rules of Professional Conduct 1.7 [conflict of

interest] and 8.4 [dishonesty, fraud, deceit, and/or misrepresentation and conduct that seriously

interfered with the administration of justice].  After twelve days of trial, the Hearing Committee

issued a 157 page report dated September 28, 2012 that concluded

> ¶306.   The Hearing Committee has listened to arguments and testimony for
> twelve hearing days, carefully reviewed over 3,800 pages of transcript (including
> the two pre-hearing conferences) and several more thousand pages comprising the
> 228 exhibits admitted in evidence, and considered the arguments set forth in the
> approximately 300 pages of briefs submitted by the parties.  **This careful review
> enables us to say, with confidence, that there is no credible evidence, much
> less clear and convincing evidence, supporting any of Bar Counsel's charges.
> (emphasis added)**

> and

> ¶308.   It is nevertheless clear that Mrs. Abbott's "case" against the Respondents
> became Bar Counsel's "case" against Respondents. Bar Counsel asked Mrs.
> Abbott to attest to the truthfulness of her complaining letters.  But Bar Counsel's
> charges were substantially undermined by Mrs. Abbott's hostility and bias against
> Respondents, as clearly demonstrated in Mrs. Abbott's cross examination.
> **Further, Bar Counsel's serious misunderstanding of District of Columbia law
> with respect to mental capacity and consequently her failure to show that
> Mrs. Ackerman lacked capacity to interact with Respondents requires that
> the charges be dismissed.  (emphasis added)**

The Board on Professional Responsibility affirmed the Hearing Committee's findings and dismissed all charges against the Szymkowiczes, and the Court of Appeals did the same. *See* Board reports dated July 25, 2014 and May 17, 2017 and Court of Appeals opinions dated September 17, 2015 and November 8, 2018.

## C.     Professor Frisch's Blog Posts

After the Hearing Committee found against Disciplinary Counsel Porter in her case against the Szymkowiczes, criticized her lack of judgment in accepting Mrs. Abbott's "case" as her "case" and further criticized her "serious misunderstanding" of the law in her prosecution of the Szymkowiczes, Professor Frisch took it upon himself to attempt to vindicate his friend and colleague in the press.[2]  Complaint at ¶27.  Professor Frisch did so by recklessly and maliciously defaming the Szymkowiczes in a series of blog posts - without regard to the findings of the Hearing Committee, the Board on Professional Responsibility, and the Court of Appeals – even though he claims in Docket 13-1 at 40 to have "made more than a 'reasonable investigation' as to what he wrote:  he studied the disciplinary proceedings [involving Plaintiff Szymkowicz] for years, and he reached his opinions based on his independent review of the record."  *See* Docket 13-1 at 40.   In the blog post published on November 8, 2018 entitled "District of Columbia Court Absolves Attorneys of Horrific Elder Abuse Conflict," Professor Frisch accused Plaintiff Szymkowicz of legal "misconduct," "elder care abuse," and "horrific elder abuse."  Plaintiff demanded that Professor Frisch retract these statements, and after he ignored this demand, Plaintiff filed his complaint in this case.

---

[2]     In a blog post unrelated to the Szymkowiczes, Professor Frisch admits that he is "biased in [Julia Porter's] favor."  *See* Professor Frisch's August 17, 2018 blog post entitled "D.C. Disciplinary Counsel Has New Leadership."

There is no question that Professor Frisch's assertions that Plaintiff Szymkowicz was guilty of legal "misconduct," "elder care abuse," and "horrific elder abuse," were false, and Professor Frisch does not even attempt to argue that his statements about Plaintiff Szymkowicz were true.  Professor Frisch published these assertions as fact, knowing that Plaintiff Szymkowicz has been repeatedly exonerated by the Hearing Committee, the Board on Professional Responsibility and the Court of Appeals in reports and opinions that found no elder abuse, no fraud, no misconduct, no deceit, no misrepresentation.

**D.      Procedural History of this Civil Action**

Plaintiff Szymkowicz's complaint against Professor Frisch seeks

(1) judgment on Count I [Defamation], Count II [False Light] and Count III [Intentional Infliction of Emotional Distress]; (2) presumed damages in an amount to be awarded at trial; (3) compensatory damages in an amount to be proven at trial; (4) punitive damages in an amount to be proven at trial; (5) all costs, interest, attorneys' fees and disbursement to the highest extent permitted by law; and (6) such other and further relief as this Court may deem proper.  [Docket #1.]

Professor Frisch moved to dismiss the complaint pursuant to F. R. Civ. P. 12 (b) (6) [Docket #13] and pursuant to the District of Columbia Anti-SLAPP Act [Docket #14].

## <u>ARGUMENT</u>

**I.      PLAINTIFF SZYMKOWICZ'S COMPLAINT STATES A CLAIM FOR DEFAMATION.**

**A.      The law affords a cause of action for damage to a person's reputation by the publication of defamatory statements.**

Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11 (1990).  Defamation law developed not only as a means of allowing an individual to vindicate his or her good name, but also for the purpose of obtaining redress for harm caused by such statements. *Id*.

**B.      Plaintiff Szymkowicz is not a "public figure**."

Plaintiff Szymkowicz is not a "public figure" in this litigation.  Public figures are those who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues, or otherwise, invite attention and comment."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974).  In other words, an individual who does not thrust himself into the vortex of a public issue or engage the public in an attempt to influence a debate on a public issue is not a public figure.  *Id*. at 352.  To transition from a private individual to a public figure, a person must assume special prominence in the resolution of public questions.  *Id*. at 351.  The plaintiff in *Gertz* was a lawyer who was appointed to serve on a public committee, and witnessed the coroner's inquest into the death of his client's child, but was not a "de facto public official."  *Id*.  at 351 (1974).  These facts did not transform the *Gertz* plaintiff from a private individual into a public official, even though attorneys are "officers of the court," since a contrary holding would "distort the plain meaning of the 'public official' category beyond all recognition."  *Id*.   Additionally, although the *Gertz* plaintiff was "active in community and professional affairs," "served as an officer of local civic groups and of various professional organizations," "published several books and articles on legal subjects" and was "known in some circles," he "had achieved no general fame or notoriety in the community" and "[n]one of the prospective jurors at the trial had ever heard of [the plaintiff]."  *Id*. at 351-52.  The *Gertz* court found that

> [w]e would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes.  Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.  It is preferable to reduce the public-figure question to a more meaningful context by looking at the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.  *Id*. at 352.

In *Wolston v. Reader's Digest Association*, 443 U.S. 157, 162 (1979), the plaintiff's aunt and uncle were charged with spying for the Soviet Union and pled guilty to this charge. After the plaintiff's aunt and uncle pled guilty to espionage, the FBI turned its focus toward other alleged participants in a Soviet spy ring, including the plaintiff. *Id*. at 161-62. After the plaintiff pled guilty to the contempt charge for failing to appear before a grand jury investigating Soviet espionage activities, the court placed him on probation. *Id*. at 162-63. During the period between his failure to appear before the grand jury and his sentencing on the contempt charge, the plaintiff's name appeared in fifteen newspapers articles, but this flurry of publicity subsided following his sentencing and thereafter he "succeeded for the most part in returning to the private life he had led prior to issuance of the grand jury subpoena." *Id*. at 163. The court found that the plaintiff "led a thoroughly private existence prior to the grand jury inquiry and returned to a position of relative obscurity after his sentencing. The plaintiff achieved no general fame or notoriety and assumed no role of special prominence in the affairs of society as a result of his contempt citation or because of his involvement in the investigation of Soviet espionage." *Id*. at 165. Moreover, the "'undisputed facts' do not justify a conclusion that the plaintiff 'voluntarily thrust' or 'injected' himself into the forefront of the public controversy surrounding the investigation of Soviet espionage." *Id*. at 165-66. Rather, the plaintiff was "dragged unwillingly into the controversy" by a Government who "pursued him in its investigation." *Id*. at 166. The plaintiff "never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge," and "played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage." *Id*. at 167. Therefore, the court declined to hold that the plaintiff's mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage. *Id*.

Moreover, the court found that a private individual is not automatically transformed into a public figure simply by becoming involved in or associated with a matter that attracts public attention. *Id*.  The court also held that a person who engages in criminal conduct does not automatically become a public figure "for purposes of comment on a limited range of issues relating to his conviction."  *Id*. at 168 (1979).  The court, quoting *Time, Inc. v. Firestone*, 457 U.S. 448, 457 (1976), concluded that

> While participants in some litigation may be legitimate 'public figures,' either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others.  There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom.  *Id*. at 166.

In *Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017), the court set forth the test of whether a defamation plaintiff is a public figure

> First, the court must identify the relevant controversy and determine whether it is a public controversy.  Second, the plaintiff must have played a significant role in that controversy.  Third, the defamatory statement must be germane to the plaintiff's participation in the controversy.

Whether a person is a public figure or not is a matter of law for the court to decide.  *Id*.  For the reasons that follow, Plaintiff is not a public figure under *Gertz*, *Wolston* and *Kahl*.

### 1.    The disciplinary proceeding involving Plaintiff was not a "public controversy."

In *Kahl*, the court found that "[a]n issue is a 'public controversy' if it is 'being debated publicly' and has 'foreseeable and substantial ramifications for nonparticipants.'"  *Kahl*, 856 F.3d at 113.  In determining whether there is a public controversy, "a court examines whether the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  *Id*.

In *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-97 (D.C. Cir. 1980), the court found that "[c]ourts must exercise care in deciding what is a public controversy" since "[n]ewsworthiness alone will not suffice, for the alleged defamation itself indicates that someone in the press believed that the matter deserved media coverage."  Rather, a "public controversy is not simply a matter of interest to the public;  it must be a real dispute, the outcome of which affects the general public or some segment of it in appreciable way."  *Id*. at 1296.  In other words, "a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants."  *Id*.  In *Waldbaum*, the court found that

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question.  A general concern or interest will not suffice.  The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.  It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.  If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy.  *Id*. at 1297.

Outside of Professor Frisch's blog posts, Plaintiff is not aware of any article about the disciplinary proceedings in his case, other than a single article published a few weeks after the Hearing Committee issued its report in 2012.  By the time of the issuance of the Court of Appeals' final decision in Plaintiff's case in November 2018, Professor Frisch was the only writer publicly commenting on this matter.  The disciplinary proceedings involving Plaintiff had no "foreseeable" or "substantial ramifications" for non-participants.  Plaintiff's disciplinary proceedings did not rise to the level of a "public controversy" under *Kahl*.

### 2.    Plaintiff did not play a "significant role" in the disciplinary proceedings into which he was involuntarily brought.

"Limited-purpose public figures have 'thrust themselves to the forefront' of a public controversy "in order to influence the resolution of the issues involved," and to "resolve that question," the court should consider "the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct or statements." *Kahl*, 856 F.3d at 114.  In *Kahl*, the court found that the plaintiff "thrust himself to the forefront of the controversy and has worked to maintain his place in the spotlight" by assuming a "public role in the controversy" by using "his access to the press to promote his cause," including giving "extensive interviews" for a documentary film, publishing a book "about his case and its relationship to the anti-government and anti-tax movement" and maintaining a website where he "criticized his conviction and promoted his political views." *Id*.  Plaintiff Szymkowicz never assumed any "public role in the controversy," gave interviews about the disciplinary proceedings or used the press to "promote" his defense of the disciplinary charges.  Rather, he simply wanted this matter to go away. Therefore, he did not take a "role in the controversy."

### 3.    Professor Frisch's defamatory statements were not "germane" to the Plaintiff's involvement in the disciplinary proceedings.

Professor Frisch claims that his intent in publishing the blog post at issue was to provide a "passionate criticism of the District of Columbia attorney discipline system" that criticized "not the plaintiff but the District of Columbia's attorney discipline process." *See* Docket 13-1 at 27-28.  Professor Frisch also claims that the statements in the blog "are not directed to [Plaintiff Szymkowicz]." *Id*.  In *Kahl*, the court found that the purpose of the germaneness inquiry "is to ensure that the allegedly defamatory statement – whether true or not – is related to the plaintiff's role in the relevant public controversy. *Kahl*, 856 F.3d at 114.  This "ensures that publishers

cannot use an individual's prominence in one area of public life to justify publishing negligent

falsehoods about an unrelated aspect of the plaintiff's life." *Id*.  Professor Frisch's admission

that the blog post at issue does not criticize Plaintiff Szymkowicz, but rather, the District of

Columbia's attorney discipline process system, results in a finding that these were not "germane"

to Plaintiff's involvement in the disciplinary proceedings.

    C.    **As a private individual, Plaintiff only needs to prove that Professor Frisch published his defamatory statements with negligence.**

In *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980), the court found

that "the basic standard of care in the District of Columbia for media defamation of private

individuals, so far as actual damages are involved, becomes translated by *Gertz* from strict

liability to its next most proximate standard of care – that of negligence."  In *Milkovich*, 497 U.S.

at 20, the court found that "where a statement of 'opinion' on a matter of public concern

reasonably implies false and defamatory facts regarding public figures or officials, those

individuals must show that such statements were made with knowledge of their false

implications or with reckless disregard of their truth.  Similarly, where such a statement involves

a private figure on a matter of public concern, a plaintiff must show that the false connotations

were made with some level of fault."  Thus, as a private individual, Plaintiff only needs to prove

that Professor Frisch published his defamatory statements with negligence in order to state a

cause of action.

    D.    **Plaintiff was the "subject of a false and defamatory statement"**

        1.    **Professor Frisch's statements that accused Plaintiff of legal "misconduct," "elder care abuse,' and "horrific elder abuse" were defamatory *per se*.**

In *Grossman v. Goemans*, 631 F. Supp. 972, 974 (D. D.C. 1986), the court found that

"false allegations of criminal conduct are libelous *per se*, and thus actionable without proof of

12

special damages."  D.C. Code § 22-931, *et seq*., entitled the "Criminal Abuse, Neglect, and

Financial Exploitation of Vulnerable Adults and the Elderly Act of 2000," makes elder abuse a

crime in the District of Columbia.  In *Competitive Enterprise Institute v. Mann*, 150 A. 3d 1213,

1242-43 (D.C. 2016), the court quoted *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) for its

holding that a "statement that 'a father set up his son in business' accuses the father of nepotism

and is defamatory because it, 'might tend to injure him in his trade, profession or community

standing, or lower him in the estimation of the community."  Moreover, if an article called a

scientist "the Jerry Sandusky of climate science," a jury could find that this "noxious

comparison" could demean the scientist's reputation and lower his or her standing in the

community by making them appear "odious, infamous, or ridiculous."  *Id*. at 1243-44.  It is clear

that Plaintiff was the "subject" of Professor Frisch's statement that he was guilty of "elder

abuse" and other professional "misconduct."  Since elder abuse is a crime in the District of

Columbia, Professor Frisch's claim that Plaintiff is an elder abuser is defamatory *per se*.

Professor Frisch's allegation that Plaintiff is guilty of professional misconduct demeans his

reputation and lower his standing in the community by making him appear "odious, infamous, or

ridiculous."

### E.    Professor Frisch's defamatory statements were not "unactionable opinions" since they capable of "objective verification," *i.e.*, can be proven true or false.

Rather than defending the falsity of his words, Professor Frisch tries to hide behind the

"opinion defense" – the last bastion of the apprehended defamer.  Professor Frisch now says that

his allegations are "protected speech" because they are "statements of opinion rather than fact."

*See* Docket 13-1 at 28.  Rather remarkably, Professor Frisch attempts to defend his statements as

"opinion" without even addressing the seminal Supreme Court case on the opinion defense.  *See*

*Milkovich*, 497 U.S. 1.  Nor does he even cite the recent decision of the District of Columbia

Court of Appeals in *Mann*, 150 A. 3d 1213.  Both of these cases clearly hold that speech is not

opinion if it asserts a verifiable fact.  For whatever reason, Professor Frisch instead discusses the

law prior to *Milkovich* and *Mann ,*and as such fails to address the critical issue of "verifiability."

Yet, Professor Frisch's allegations that Plaintiff engaged in professional misconduct and elder

abuse are plainly verifiable.  These types of allegations are capable of being adjudicated as true

or false.  Professional misconduct charges are governed by the Rules of Professional Conduct

and elder abuse is a crime under D.C. Code § 22-931, *et seq*.  They are, by definition, verifiable

in a disciplinary proceeding or a court of law.

The  Supreme Court is clear on this "opinion defense" – whether the defamatory

statement appears in a news story, an editorial or on Professor Frisch's blog, the opinion defense

fails if the statement is capable of "objective verification," *i.e.*, if the statement can be proven

true or false.  *See Milkovich*, 497 U.S. at 20-21 (1990).  In *Milkovich*, an author implied in a

newspaper article that a wrestling coach lied under oath in a judicial proceeding about an

incident at a wrestling match and asserted the opinion defense.  *Milkovich*, 497 U.S. at 3.  As the

Court stated:

> If a speaker says, 'In my opinion, John Jones is a liar,' he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth.  Even if the speaker
> states the facts upon which he bases his opinion, if those facts are either incorrect
> or incomplete, or if his assessment of them is erroneous, the statement may still
> imply a false assertion of fact.  Simply couching such statements in terms of
> opinion does not dispel these implications; and the statement, 'In my opinion
> Jones is a liar,' can cause as much damage to the reputation as the statement,
> 'Jones is a liar.'  As Judge Friendly aptly stated [in *Cianci v. New Times
> Publishing Co.*, 639 F. 2d 54, 61 (2nd Cir. 1980)]: 'It would be destructive of the
> law of libel if a writer could escape liability for accusations of defamatory
> conduct simply by using, explicitly or implicitly, the words 'I think."  *Id*. at 18-
> 19.

In *Milkovich*, the court concluded that the clear impact of the article was that Mr. Milkovich lied

at the hearing after having given his solemn oath to tell the truth.  *Id*. at 21.  The allegation that

Mr. Milkovich committed perjury "is sufficiently factual to be susceptible of being proved true or false" based on "objective evidence" by reviewing his testimony before the trial court." *Id.* at 21. The court added that "[u]nlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id.* at 22.

In *Mann*, the court followed *Milkovich*, and found that:

Although ideas and opinions are constitutionally protected, the First Amendment does not, however, create a wholesale defamation exemption for anything that might be labeled 'opinion.' Statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false. Whether a defamatory statement of opinion is actionable often depends on the context of the statement in question. If, for example, an average reader would likely understand that particular words, in the context of an entire article, were not meant to imply factual data but, rather, were intended merely to disagree strongly with the views of the plaintiff, those words would be protected despite their factual content. Thus, statements that constitute, 'imaginative expression' and 'rhetorical hyperbole' are not actionable because they cannot reasonably be interpreted as stating actual facts about an individual. Such statements are used not to implicate underlying acts but merely in a 'loose, figurative sense' to demonstrate strong disagreement with another's ideas. On the other hand, a statement is actionable if viewed in context it was capable of bearing a defamatory meaning and contained or implied provably false statements of fact." *Mann*, 150 A. 3d at 1241-42.

There is a difference between statements expressing ideas and false statements of fact." *Id.* at 1242. To the extent statements "take issue" with the "soundness" of "methodology and conclusions – *i.e.*, with ideas in a scientific or political debate – they are protected by the First Amendment." *Id.* But, defamatory statements that are personal attacks on an individual's honesty and integrity and assert or imply as fact that an individual engaged in professional misconduct and deceit, if false, do not enjoy constitutional protection and may be actionable. *Id.* The *Mann* court concluded that:

Tarnishing the personal integrity and reputation of a scientist important to one side may be a tactic to gain advantage in a no-holds-barred debate over global warming. That the challenged statements were made as part of such debate provides important context and requires careful parsing in light of constitutional standards. But if the statements assert or imply false facts that defame the

individual, they do not find shelter under the First Amendment simply because
they are embedded in a larger policy debate.  *Id*. at 1242-43.

A statement of opinion is not actionable is because, not being factual, it cannot be proved false.
*Id*. at 1244.  The First Amendment gives no protection to an assertion sufficiently factual to be
susceptible of being proved true or false even if the assertion is expressed by implication in a
statement of opinion.  *Id*.

Other precedent on this issue is *Jankovic v. International Crisis Group*, 593 F. 3d 22, 28
(D.C. Cir. 2010),  in which the court rejected the publisher's argument that the defamatory
statement was protected as opinion because it was offered as the writer's interpretation of a fact
that was disclosed in the report, noting that this protection applies only where opinion is based
on true facts, accurately disclosed.  In *Jankovic*, the court found that because an inaccurate fact
(that one of the plaintiff's companies was on a frozen assets list because it provided support to
the Milošević regime) was cited as the basis of the report's purported opinion that the plaintiff
supported the regime in exchange for favorable treatment of his businesses, the defamatory
statement was not protected as opinion.  *Id*.

In this case, Professor Frisch's claim that that Plaintiff engaged in professional
misconduct and is guilty of the crime of elder abuse is defamatory, despite his contention that
such findings are his opinion, since such allegations are "sufficiently factual to be susceptible of
being proved true or false" and are capable of "objective verification."  *See Milkovich*, 497 U.S.
at 20-21.  Neither the Hearing Committee, the Board on Professional Responsibility nor the
Court of Appeals ever found that Plaintiff engaged in professional misconduct or was guilty of
elder abuse.  Professor Frisch's allegations are verifiable and his opinion defense does not apply.

F.     **Professor Frisch's defamatory statements were not a "supportable interpretation" of the findings of the Hearing Committee, the Board on Professional Responsibility or the Court of Appeals.**

Professor Frisch also attempts to suggest that his allegations are protected because they are supportable interpretations of the disciplinary proceedings, citing *Moldea v. New York Times Co.*, 22 F. 3d 310, 311 (D.C. Cir. 1994) [known as *Moldea II*].  In that case, the plaintiff was an author who claimed that he was defamed in a book review that stated that his book was marred by "sloppy journalism."  The court found that the challenged statements in the book review are "supportable interpretations" of the book, and that the review was "substantially true."  *Id*. at 312.  The court also noted that in a book review, some leeway must be given to offer "rational interpretations" of ambiguous sources since a book review is an evaluation of a literary work which appear "in a forum in which readers expect to find such evaluations."  *Id*. at 313.  In *Moldea II*, the allegedly libelous statements were "evaluations" that were "quintessentially of a type readers expect to find" in a book review.  *Id*. at 315.    The court also found that "[t]his 'supportable interpretation' standard provides that a critic's interpretation must be rationally supportable by reference to the actual text he or she is evaluating," and thus, '**would not immunize situations' in which a writer 'launches a personal attack, rather than interpreting a book.**'" [emphasis added].  *Id*.  This standard also establishes boundaries even for textual interpretation:  "A critic's statement must be a rational assessment or account of something the reviewer can point to *in the text,* or *omitted from the text,* [emphasis in original] being critiqued."  *Id*.

The supportable interpretation defense plainly does not apply here given the "personal attack" and the simple fact that the elder abuse allegation cannot be rationally supported by any reference to the underlying disciplinary proceedings.  This point was further underscored in the

17

*Mann* case, which rejected the defense given the "garden variety" nature of the allegation and the simple fact that the allegation was clearly verifiable, considerations equally applicable here—and controlling on this issue.  *See Mann*, 150 A. 3d at 1249 n. 45.

> **G.     Professor Frisch's defamatory statements do not fall under the "fair comment" privilege**

In *Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C. 1965), the court found that "[f]air comment or criticism on a matter of public interest is not actionable so long as the comment is not motivated by malice" "or go beyond a discussion of the public works or acts of the subject of the opinion," "[s]o long as the comment is the speaker's actual opinion, based on fact, about a matter of public interest."  Thus, critical comments about works of literature, musical performances, or store owners have been found to be within the fair comment doctrine. *Id*.  An example of a criticism falling within the fair comment doctrine is an art review in which the critic "comments about the manner in which an art gallery presents its paintings, for the public is as much interested in the display as in the paintings themselves." *Id*.  This is because a statement that a picture in an art exhibit is "badly hung," is clearly a matter of opinion since such statements are neither false nor true. *Id*.  "The fair comment defense goes only to opinions expressed by the writer and does not extend to misstatements of fact." *Id*.  Here, Professor Frisch's allegations that Plaintiff Szymkowicz engaged in professional misconduct and committed the crime of elder abuse were misstatements of fact, and did not relate to any type of "review," such as a book review, and thus, Professor Frisch is not protected by the fair comment privilege.

### H.      Professor Frisch's defamatory statements do not fall under the "fair report" privilege

In *Oao Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 40 (D. D.C. 2005),

the court found that there is a "fair report" privilege that "is a recognized exception to the

common law rule that the republisher of a defamation is deemed to have adopted the underlying

defamatory statements as its own."  The fair report privilege will apply "when it is apparent

either from specific attribution or from the overall context that the article is quoting,

paraphrasing, or otherwise drawing upon official documents or proceedings, and the article is a

fair and accurate account of the document or proceeding.  *Id*.  The writer, must, however, clearly

attribute the statement in question to the official proceeding or document on which he or she is

reporting or from which he or she is quoting.  *Id*. at 41 n. 40.  In fact, the court in *Oao Alfa Bank*

found that an appropriate attribution would be the use of the words the "report claimed" or the

"report said."  *Id*.  Moreover, in order to qualify for the fair report privilege, an article

summarizing an official action or proceeding must provide an accurate and complete description

of the proceeding or a fair abridgment of the proceeding, in addition to being fair and impartial.

*See Luvin v. Kunin*, 17 P. 3d 422, 427 (Nev. 2001).  The fair report privilege certainly does not

apply here.  In no way can the elder abuse allegation be a fair account or a fair abridgement of

the disciplinary proceedings.

### I.      Professor Frisch acted with "actual malice" and "reckless disregard for the truth."

In *Mann*, the court found that "[a] plaintiff may prove actual malice by showing that the

defendant either (1) had 'subjective knowledge of the statement's falsity,' or (2) acted with

'reckless disregard for whether or not the statement was false.'"  *Mann*, 150 A. 3d at 1252.  A

finding of actual malice is a question of law.  *Id*. at 1252, n. 52.  The "'subjective' measure of the

actual malice test requires the plaintiff to prove that the defendant actually knew that the statement was false." *Id*. at 1252.  The "'reckless disregard' measure requires a showing higher than mere negligence;  the plaintiff must prove that the defendant in fact entertained serious doubts as to the truth of the publication." *Id*.  Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *Id*.  The plaintiff may show that the defendant had such serious doubts about the truth of the statement inferentially, by proof that the defendant had a high degree of awareness of the statement's probable falsity." *Id*.  A showing of reckless disregard is not automatically defeated by the defendant's testimony that he believed the statements were true when published; the fact-finder must consider assertions of good faith in view of all the circumstances. *Id*.  Recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id*.

In *Mann*, the court found that several entities, including the United Kingdom House of Commons and the National Science Foundation, all conducted investigations and issued reports concerning Dr. Mann's alleged research or scientific misconduct, would could relate to the defendants' claims of "dishonesty," "fraud" or "misconduct." *Id*. at 1253.  While the defendants in *Mann* contended that they had a "subjective and honest belief in the truth of their statements," the court held that "[t]he issue for the court is whether, taking into account the substantive conclusions of investigatory bodies constituted to look into the very evidence – [the emails] – that [the authors'] statements claimed as factual proof of Dr. Mann's deception and misconduct, a jury could find, by clear and convincing evidence, that [the authors] acted with 'actual malice." *Id*. at 1255.

> In the case before us now, not one but four separate investigations were
> undertaken by different bodies following accusations, based on [several emails],

that Dr. Mann had engaged in deceptive practices and scientific and academic misconduct.  Each investigation unanimously concluded that there was no misconduct.  Reports of those investigations were published and were known to [the authors] prior to [their] articles continuing to accuse Dr. Mann of misconduct based on the emails that were the subject of the investigations.  Applying the reasoning in *Nader v. de Toledano*, 408 A.2d 31 (D.C. 1979), to the evidence now of record in this case, we conclude that a jury could find that [the authors'] defamatory statements were made with actual malice.  *Id*. at 1258.

Additionally, the *Mann* court found that where the allegations that Dr. Mann engaged in misconduct have been so definitively discredited,

a reasonable jury could, if it so chooses, doubt the veracity of [the authors'] claimed honest belief in that very notion.  A jury could find, by clear and convincing evidence, that [the authors] 'in fact entertained serious doubts' or had a 'high degree of awareness' that the accusations that Dr. Mann engaged in scientific misconduct, fraud, and deception, were false, and as a result, acted with 'reckless disregard' for the statements' truth when they were published."  *Id*. at 1260 *quoting Nader*, 408 A.2d at 41, 50-53.

The facts of this case are strikingly similar.  Here, the Hearing Committee, Board of Professional Responsibility and Court of Appeals all carefully reviewed the allegations against Plaintiff and found that he did not violate any Rules of Professional Conduct.  Yet, Professor Frisch chose to disregard these findings and not only accuse Plaintiff Szymkowicz of unethical behavior, but accused him of a criminal offense as well.  In this case, the Hearing Committee "listened to arguments and testimony for twelve hearing days, carefully reviewed over 3,800 pages of transcript (including the two pre-hearing conferences) and several more thousand pages comprising the 228 exhibits admitted in evidence, and considered the arguments set forth in the approximately 300 pages of briefs submitted by the parties."  *See* ¶306 of the Hearing Committee's Findings of Fact.  "This careful review" enabled the Hearing Committee "to say, with confidence, that there is no credible evidence, much less clear and convincing evidence, supporting any of Bar Counsel's charges [against Plaintiff Szymkowicz and his father]."  *Id*.

The Hearing Committee's findings were affirmed by the Board on Professional Responsibility and the Court of Appeals.

Without question, a reasonable jury could, if it so chooses, "doubt the veracity" of Professor Frisch's claimed "honest belief" that Plaintiff engaged in professional misconduct and committed elder abuse.  A jury could also find, by clear and convincing evidence, that Professor Frisch "in fact entertained serious doubts" or had a "high degree of awareness" that his accusations against Plaintiff Szymkowicz were false, and as a result, that Professor Frisch acted with "reckless disregard" for the truth of his allegations when they were published."  *See Mann*, 150 A.3d at 1258.

The *Mann* court added that there is "another factor that a jury could take into account in evaluating [the authors'] state of mind in publishing the statements accusing Dr. Mann of misconduct and deception"

> As the articles that form the basis of Dr. Mann's complaint make clear, [the authors'] are deeply invested in one side of the global warming debate that is opposed to the view supported by Dr. Mann's research.  Although animus against Dr. Mann and his research is by itself insufficient to support a finding of actual malice where First Amendment rights are implicated, bias providing a motive to defame by making a false statement may be a relevant consideration in evaluating other evidence to determine whether a statement was made with reckless disregard for its truth.  *Id*. at 1258-59.

In this case, Professor Frisch is "deeply invested" in protecting his friend and colleague, Julia Porter, who prosecuted Plaintiff during his disciplinary proceedings.  In fact, Professor Frisch admits that he is "biased" in her favor.  *See* Professor Frisch's August 17, 2018 blog post entitled "D.C. Disciplinary Counsel Has New Leadership."  In paragraph 308 of its findings of fact, the Hearing Committee found that

> It is nevertheless clear that Mrs. Abbott's "case" against the Respondents became Bar Counsel's "case" against Respondents. Bar Counsel asked Mrs. Abbott to attest to the truthfulness of her complaining letters.  But Bar Counsel's charges

> were substantially undermined by Mrs. Abbott's hostility and bias against
> Respondents, as clearly demonstrated in Mrs. Abbott's cross examination.
> Further, Bar Counsel's serious misunderstanding of District of Columbia law with
> respect to mental capacity and consequently her failure to show that Mrs.
> Ackerman lacked capacity to interact with Respondents requires that the charges
> be dismissed.

Therefore, although animus against Plaintiff may not, by itself, insufficient to support a finding of actual malice, bias providing a motive for Professor Frisch to defame by making a false statement, may be a relevant consideration in evaluating other evidence to determine whether a statement was made with reckless disregard for its truth.  In *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979), the court found

> The existence of actual malice may be shown in many ways. As a general rule,
> any competent evidence, either direct or circumstantial, can be resorted to, and all
> the relevant circumstances surrounding the transaction may be shown, provided
> they are not too remote, including threats, prior or subsequent defamations,
> subsequent statements of the defendant, circumstances indicating the existence of
> rivalry, ill-will, or hostility between the parties, facts tending to show a reckless
> disregard of the plaintiff's rights, and, in an action against a newspaper, custom
> and usage with respect to the treatment of news items of the nature of the one
> under consideration.

In combination with the fact that neither the Hearing Committee, the Board on Professional Responsibility nor the Court of Appeals found that Plaintiff engaged in professional misconduct or committed elder abuse, Professor Frisch's bias in favor of Ms. Porter and his desire to take up the cudgel after Ms. Porter's embarrassing defeat and tarnish Plaintiff's reputation "may be a relevant consideration" in determining whether his allegations were made with reckless disregard for the truth.

**J.    The complaint states claims for defamation upon which relief may be granted.**

Under F. R. Civ. P. 12 (b) (6), a party may move to dismiss a complaint on the grounds that it fails to state a claim upon which relief may be granted.  *Sims v. Sunovion*

*Pharmaceuticals, Inc.*, 2019 U.S. Dist. LEXIS 25802 *11-12 (D. D.C. 2019).  In order to survive dismissal under F. R. Civ. P. 12 (b) (6), a complaint must contain sufficient factual allegations that, if accepted as true, state a claim to relief that is plausible on its face.  *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*.  For the foregoing reasons, Plaintiff Szymkowicz's complaint states claims upon which relief may be granted, and therefore, the case should survive dismissal.

## II.     THE COMPLAINT STATES A CLAIM FOR FALSE LIGHT.

In *Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D. D.C. 2017), the court held that "a false light claim requires a showing of (1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person."  In *Smith*, the court held that because causes of action for defamation and false light "share similar elements, they are often analyzed in the same manner, especially where the plaintiff rests both his defamation and false light claims on the same allegations."  *Id*.  In addition, the trial court in *Smith* found that "[w]hile the elements of false light are similar to the elements of defamation, the remedies are distinct.  A defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view."  *Id*.  In ruling on appeal in *Smith*, the D.C. Circuit found that "[b]ecause defamation and false light are so similar, a plaintiff may plead them as alternatives and a reviewing court must also satisfy itself that the statement does not arguably place the plaintiff in a 'highly offensive' false light in addition to finding the statements are not capable of defamatory meaning."  *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018).

24

In this case, the statements that Professor Frisch published on his blog were false statements that Plaintiff was guilty of the crime of elder abuse.  It was clear these false statements placed Plaintiff in a false light that would be offensive to a reasonable person, considering that Plaintiff is a practicing attorney in the District of Columbia, and all attorneys place a special value on their reputation due to their special status as officers of the court. Therefore, the false light claim should survive since it contains sufficient factual allegations that, if accepted as true, states a claim to relief that is plausible on its face."  *See Sunovion Pharmaceuticals, Inc.*, 2019 U.S. Dist. LEXIS 25802 at *12.

## III.   THE COMPLAINT STATES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In *Mann*, the court found that in order to establish a prima facie case of intentional infliction of emotional distress, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Mann*, 150 A. 3d at 1260.  Additionally, *Mann* found that the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id*. Professor Frisch's false statement that Plaintiff was an "elder abuser" is unquestionably extreme and outrageous since Plaintiff is not, and never was, someone who abused the elderly.  As previously stated, "elder abuse" is a crime in the District of Columbia, and therefore, Professor Frisch's claim that Plaintiff is an elder abuser is defamatory *per se*.  *See* D.C. Code § 22-931, *et seq*.

Professor Frisch's admission that he "made more than a 'reasonable investigation' as to what he wrote" and "studied the disciplinary proceedings closely for years, and reached his opinions based on his independent review of the record" [*See* Docket 13-1 at 40] satisfies the

25

second element of his emotional distress claim since Professor Frisch published the elder abuse allegation "intentionally," or, alternatively, since there were no facts in the record to support such a charge, "recklessly."

In *El-Hadad v. Embassy of the United Arab Emirates*, 2006 U.S. Dist. LEXIS 21491 *49 (D. D.C. 2006), the court found that statements that are defamatory *per se*, by their very nature, are likely to cause mental and emotional distress, as well as injury to reputation." Paragraphs 58-59 of the complaint sets forth facts that show that he suffered severe emotional distress, mental anguish and personal humiliation due to the harm to his character and reputation resulting from Professor Frisch's allegations. Therefore, the claim for intentional infliction of emotional distress claim should survive since it contains sufficient factual allegations that, if accepted as true, states a claim to relief that is plausible on its face." *See Sunovion Pharmaceuticals*, 2019 U.S. Dist. LEXIS 25802 at *12.

## IV.   THE COURT HAS SUBJECT MATTER JURISDICTION.

This Court cannot find, as a legal certainty, that Plaintiff's damages are less than the $75,000 jurisdictional limit of the District Court. In *Robertson v. McCloskey*, 680 F. Supp. 414, 415 (D. D.C. 1988), the court found that a successful libel plaintiff can recover three types of damages – nominal, compensatory or punitive. Compensatory damages may be further subdivided into general and special damages. *Id.* In *El-Hadad v. Embassy of the United Arab Emirates*, 2006 U.S. Dist. LEXIS 21491 *46-47 (D. D.C. 2006), the court found that defamation *per se* renders a defendant liable for general damages even where no special damages are proved. General damages compensate a plaintiff for harm to his reputation or emotional well-being, special damages, on the other hand, are awarded for losses of an economic or pecuniary nature. *Id.* Where a plaintiff is neither a public official nor a public figure, and where the defamatory

statements involve no issue of general public importance, proof of defamation *per se* entitles the injured party to presumed general damages, that is, the general damages may be presumed and do not have to be proved.  *Id*.  Awards for injury to reputation, humiliation and mental anguish are not susceptible of precise estimation and proof, which is the very reason the common law historically permitted the damage from defamation *per se* to be presumed.  *Id*. at 49.  In *El-Hadad*, the court found that "[t]he experience and judgment of history shows that proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of the publication, it is all but certain that serious harm has resulted in fact."  *Id*.  In *El-Hadad*, the court also found that "[f]actors considered in determining the amount of presumed damages include the reputation of the defamed party prior to the defamation, the probable as well as proved effect of the defamation on his profession, how widely the defamation was disseminated, the duration of the effect of the defamation, and whether there has been a timely and effective retraction and apology, but the motive and purpose of the publisher is not to be considered in presumed damages."  *Id*.  The factfinder determines the amount of the plaintiff's general damages, whether presumed or proved.  *Id*.

In *Grossman*, 31 F. Supp. at 974, the court found that in libel cases, punitive damages are permitted when it is shown that the defendant acted with knowledge of falsity or reckless disregard for the truth.  Punitive damage awards must be large enough to act as an effective deterrent and should not be larger.  *Id*.  Punitive damage awards may take into account any profit made by the defendant as a result of the libel, as well as plaintiffs' litigation costs.  *Id*.

In *Gertz*, 418 U.S. at 349-50, the court held that

[w]e need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions.  Suffice it to say that actual injury is not limited to out-of-pocket loss.  Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation

and standing in the community, personal humiliation, and mental anguish and
suffering.  Of course, juries must be limited by appropriate instructions, and all
awards must be supported by competent evidence concerning the injury, although
there need be no evidence which assigns an actual dollar value to the injury.

This Court cannot, under the test set forth in *Freeman Holdings of Arizona, L.L.C. v.
Doe*, 2013 U.S. Dist. LEXIS 8038 (D. Az. 2013), a case cited by Professor Frisch, find, as a legal

certainty, that Plaintiff Szymkowicz's damages are less than the $75,000 jurisdictional limit of

the District Court, given that he is a practicing attorney in the District of Columbia with a clean

disciplinary history.  Under F. R. Civ. P. 12 (b) (1), a court must dismiss a case when it lacks

subject matter jurisdiction.  *Sunovion Pharmaceuticals*, 2019 U.S. Dist. LEXIS 25802 at *12 In

determining whether there is jurisdiction, the Court may consider the complaint supplemented by

undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts.  *Id*.  In other words, the court may consider materials

outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.

*Id*.  At the motion to dismiss stage, complaints are to be construed with sufficient liberality to

afford all possible inferences favorable to the pleader on allegations of fact and must accept as

true all such allegations.  *Id*.

In *Freeman Holdings*, 2013 U.S. Dist. LEXIS 8038 at *1-2, a plaintiff in a defamation

case filed a complaint with a prayer for relief that sought "general compensatory and special

damages in an amount to be proven at trial, as well as punitive damage," but the complaint

"offered no amount more specific than damages 'exceeding the minimum jurisdictional amount

of $75,000.'"  At first, the court denied the defendant's motion to dismiss for failure to satisfy

the jurisdictional amount, but after the plaintiff acknowledged during a pretrial conference that it

would not present evidence during trial of "special or out-of-pocket damages," the court filed an

order for the plaintiff to show cause what the case should not be dismissed for failure to satisfy

the jurisdictional amount issue.  *Id*.  *Freeman Holdings* cited *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938) for the holding that "it must appear to a legal certainty that the jurisdictional amount is not satisfied" and "[a] court fill dismiss a suit if 'from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount.'"  *Id*. at *3.  The court found that it is "virtually impossible for Plaintiff to win a jury award reaching the jurisdictional threshold" since he will present the jury with no evidence of harm," and thus, the court dismissed the case.  *Id*. at *5 and *11-13.

Here, Plaintiff **will** present evidence of harm to the jury, unlike the *Freeman Holdings* plaintiff, who stated that he would not.  It is clear that Plaintiff Szymkowicz's alleges damages, including, but not limited to actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.  *See Gertz*, 418 U.S. at 349-50.  This Court cannot, under the test set forth in *Freeman Holdings*, find, as a legal certainty, that Plaintiff's damages are less than the $75,000 jurisdictional limit of the District Court.

## V.     IT IS SETTLED THAT THE D.C. ANTI-SLAPP ACT DOES NOT APPLY IN THIS COURT.

### A.     The *Abbas* and *Mann* Cases.

In *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2014), an opinion authorized by Judge (now Justice) Kavanaugh, the court held that a federal court exercising diversity jurisdiction may not apply the D.C. Anti-SLAPP Act's special motion to dismiss provision, and instead, must apply F. R. Civ. P. 12 and F. R. Civ. P. 56 for granting pre-trial judgment to defendants in cases in federal court.  In other words, "[a] federal court must

apply those Federal Rules instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision." *Id*. In *Mann,* decided a few years later, the court stated as follows

> The applicability of the Anti-SLAPP statute in federal court is not for this court to determine. *Abbas* recognized that at the time, this court 'has never interpreted the D.C. Anti-SLAPP Act's likelihood of success standard to simply mirror the standards imposed by' [F. R. Civ. P. 56]. We do so now. This court's interpretation of the standard applicable to the special motion to dismiss under District of Columbia law will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act in litigation brought in federal courts. *Id*. at 1238. n.32 *quoting Abbas*, 783 F. 3d at 1333-35.

On the basis of the *Mann* decision regarding the similarity of standards, it has been asserted in a number of cases that the Anti-SLAPP law should now be applied in the federal courts of the District of Columbia, and Professor Frisch asserts the same. However, all decisions since then have rejected that attempt, and it should be rejected here as well.

**B.**     **After *Abbas* and *Mann*, the District Court for the District of Columbia has made clear on multiple occasions that the D.C. Anti-SLAPP Act does not apply in federal courts whose jurisdiction is based upon diversity of citizenship.**

After *Abbas* and *Mann*, the District Court for the District of Columbia has made clear on multiple occasions that the D.C. Anti-SLAPP Act does not apply in federal courts whose jurisdiction is based upon diversity of citizenship. *See Deripaska v. Associated Press*, Civil Action No. 17-00913 (D. D.C. Docket No. 16, October 17, 2017); *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 127-28 (D. D.C. January 4, 2018); *Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D. D.C. May 16, 2018), *subsequently dismissed in Libre v. Nexus v. Buzzfeed, Inc.*, 2018 U.S. Dist. LEXIS 210003 (December 13, 2018); *Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D. D.C. June 6, 2018); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 165 n. 2 (D. D.C. July 3, 2018); *Fridman v. Bean LLC*, 2019 U.S. Dist. LEXIS 7874, *2 (D. D.C. January 15, 2019); *Akmetshin v. Browder*, 2019 U.S.

Dist. LEXIS 157802, *10 n. 9  (D. D.C. September 16, 2019); and *Arpaio v. Zucker*, 2019 U.S.

Dist. LEXIS 189291, *14-15 (D. D.C. October 31, 2019).

      **1.**     ***Deripaska v. Associated Press*, Civil Action No. 17-00913 (D. D.C. Docket No. 16, October 17, 2017).**

In *Deripaska*, in analyzing whether the D.C. Anti-SLAPP Act applies in federal court,

Judge Huvelle found that "[*Erie v. Tompkins*, 304 U.S. 64 (1938)] mandates that a federal court

sitting in diversity apply the substantive law of the forum state, absent a federal statutory or

constitutional directive to the contrary.  Therefore, in diversity cases, all federal courts have a

duty 'to ascertain and apply the state law' as 'it controls decision.'"  *Id*. at *1.  In *Deripaska*,

Judge Huvelle observed that

> Discerning the content of state law requires deferring to the most recent decisions
> of the state's highest court, and when interpreting and applying D.C. law, courts
> fulfill this obligation by looking into the published opinions of the D.C. Court of
> Appeals.  But of course, district courts also remain bound by the decisions of the
> D.C. Circuit.  What to do when these two sources of binding precedent are in
> conflict has not been 'squarely addressed' in this Circuit.  Chief Judge Howell has
> persuasively explained [in *Easaw v. Newport*, 253 F. Supp. 3d 22 (D. D.C. May
> 12, 2017)], however, that 'when faced with conflicting authority on D.C. law,' if
> the D.C. Court of Appeals 'has spoken clearly and unmistakably as to the current
> state of D.C. law,' the district court should defer to that interpretation.  Here, the
> question is whether the D.C. Court of Appeals has spoken clearly and
> unmistakably such that this Court must depart from the D.C. Circuit's view that a
> federal court exercising diversity jurisdiction may not apply the D.C. Anti-SLAPP
> Act's special motion to dismiss provision.  The Court finds that the law at this
> time that binds this Court is the D.C. Circuit's opinion in *Abbas*, and accordingly,
> the special motion to dismiss must be denied."  *Id*. at *2 (*citations omitted*).

Judge Huvelle further stated in that *Deripaska* that "it is not for district court judges to

override the determinations of circuit precedent" and "[a]t bottom, the D.C. Circuit was clear,

and so, while the D.C. Court of Appeals' opinion in *Mann* merits analysis, it does not 'clearly

and unmistakably' resolve the question at issue here, and this Court must follow the clear

guidance of the D.C. Circuit and deny the special motion to dismiss."  *Id*. at *5.

**2.** ***Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D. D.C. May 16, 2018),** *subsequently dismissed in Libre v. Nexus v. Buzzfeed, Inc.*, **2018 U.S. Dist. LEXIS 210003 (December 13, 2018).**

In *Libre by Nexus*, Judge Mehta framed the issue: "The question before this court is whether *Mann* 'clearly and unmistakably' interprets the D.C. Anti-SLAPP Act in a way that renders the holding in *Abbas* 'inaccurate,'" and in answering this question, found that "[i]n this court's view, *Mann* does not." *Libre by Nexus*, 311 F. Supp. 3d at 159. Judge Mehta's rationale for that decision is

> Notwithstanding *Mann*'s clarification of the D.C. Anti-SLAPP Act standard, *Mann* does not 'clearly and unmistakably' compel the court to deviate from the Circuit's holding in *Abbas*. The two motion-to-dismiss standards are fundamentally at odds. First, under the D.C. Anti-SLAPP Act, a plaintiff must produce or proffer evidence to survive a special motion to dismiss. On the other hand, a plaintiff need only plead facts establishing a 'plausible' defamation claim to survive a motion to dismiss under [F. R. Civ. P. 12 (b) (6)]. The Court in *Mann* [*Mann*, 150 A.3d at 1233] recognized this difference. 'Unless something more than argument based on the allegations in the complaint is required, the special motion to dismiss created by the Act would be redundant in light of the general availability, in all civil proceedings . . . [*ellipses in original*] of motions to dismiss under [F. R. Civ. P. 12 (b) (6)].
>
> Second, [F. R. Civ. P. 12] and the D.C. Anti-SLAPP Act differ in terms of the allocation of the burden among the parties
>
>> The Act reverses the allocation of burdens for dismissal of a complaint under [F. R. Civ. P. 12 (b) (6)], giving defendants 'the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary cards on the table which makes the plaintiff liable for the defendant's costs and fees [if] the motion succeeds.
>
> Such burden-shifting at the motion to dismiss is anathema to the [F. R. Civ. P. 12 (b) (6) standard, which places the burden squarely on the defendant to justify dismissal.
>
> In view of these differences, this court must follow *Abbas* . . . and must follow the clear guidance of the D.C. Circuit in *Abbas* and deny the special motion to dismiss. *Id*. at 160-61.

      3.      ***Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158.**

In *Cockrum*, Judge Huvelle denied the defendants' motions to dismiss under the D.C. Anti-SLAAP Act, finding that "[t]he Court continues to adhere to its view that controlling precedent precludes the application of D.C.'s Anti-SLAAP Act in federal court." *Cockrum*, 319 F. Supp. 3d at 165 n.2.

      4.      ***Arpaio v. Zucker*, 2019 U.S. Dist. LEXIS 189291 (D. D.C. October 31, 2019).**

In *Arpaio*, Judge Lamberth, in denying the defendants' special motions to dismiss pursuant to the D.C. Anti-SLAAP Act, held that "[a]lthough the *Mann* court addressed the Act's requirements, it is not this Court's responsibility to instruct the D.C. Circuit on how and when to change its understanding of the D.C. Code in light of new case law." *Arpaio*, 2019 U.S. Dist. LEXIS 189291 at *16.

    **C.    This Court should deny Professor Frisch's motion to dismiss pursuant to the D.C. Anti-SLAPP Act.**

As previously stated in Section V (B) of this memorandum, at least eight cases in this Court have found that controlling precedent precludes the application of D.C.'s Anti-SLAAP Act in federal court. Consistent with the D.C. Circuit's ruling in *Abbas*, the majority of federal circuits and numerous federal district courts to have considered the issue of the applicability of Anti-SLAPP statutes in federal courts have now refused to apply state Anti-SLAPP statutes in their purest form given their procedural nature.[3] This Court should do the same.

---

[3]    *See In re Gawker Media L.L.C.*, 571 B.R. 612, 633 (Bankr. S.D. N.Y. 2017); *ABLV Bank, AS v. Center for Advanced Defense Studies Inc.*, 2015 U.S. Dist. LEXIS 181218, at *7-8 (E.D. Va. April 21, 2015) (holding that D.C.'s Anti-SLAPP Act "does not codify an immediate right to appeal and, does not create a substantive right but rather provides a procedural mechanism for review. At its core, the Act simply creates a heightened pleading standard for certain libel actions, similar to the heightened pleading requirement for fraud or mistake found in [F. R. Civ. P. 9 (b). Though not dispositive of the issue, the Act is tellingly codified in the

**D.    Even if this Court holds that the D.C. Anti-SLAPP Act applies in this case, Plaintiff has alleged claims that are "likely to succeed on the merits," and therefore, should not be dismissed.**

Even if this Court holds that the D.C. Anti-SLAPP Act applies in this case, Plaintiff Szymkowicz, as set forth in the preceding sections, has alleged claims that are "likely to succeed on the merits," and therefore, the action should not be dismissed.

## CONCLUSION

Plaintiff John Paul Szymkowicz respectfully requests that this Court deny Defendant Michael Stuart Frisch's motion to dismiss pursuant to Federal Rules of Civil Procedure 12 (b) (1) and 12 (b) (6) [Docket #13], as well as Defendant's special motion to dismiss pursuant to the District of Columbia Anti-SLAPP Act [Docket #14].

Dated:    February 6, 2019

Respectfully submitted,

By: */s/ John B. Williams*
    John B. Williams (DC Bar #257667)
    Fara N. Kitton (DC Bar #1007793)
    WILLIAMS LOPATTO PLLC
    1200 New Hampshire Ave., NW, Ste. 750
    Washington, DC  20036
    Tel.: (202) 296-1611
    jbwilliams@williamslopatto.com
    fnkitton@williamslopatto.com

---

section of the D.C. Code titled 'Judiciary and Judicial Procedure.'  It would be improper for this Court to recognize a heightened pleading standard found outside the Federal Rules of Civil Procedure. Because the Act is procedural under *Erie*, it is not applicable in federal court."); *Platinum Press, Inc. v. Douros-Hawk*, 2018 U.S. Dist. LEXIS 206655, at *5-8 (W.D. N.C. December 7, 2018); *Klocke v. Watson*, 936 F.3d 240, 249 (5th Cir. 2019), *as revised* (Aug. 29, 2019);  *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1047 (N.D. Ill. 2013) *affirmed by Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729, 732 (7th Cir. 2015);  *Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537, 550 (D. Minn. 2015); *Planned Parenthood Federation of America v. Center for Medical Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018);  *Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004);  *Los Lobos Renewable Power, L.L.C. v. Americulture, Inc.*, 885 F.3d 659, 673 (10th Cir. 2018);  *Carbone v. CNN, Inc.*, 910 F.3d 1345, 1358 (11th Cir. 2018).

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2019, a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss was filed electronically with the Clerk of Court for the United States District Court for the District of Columbia using the CM/ECF system, which sent notification of such filing to Defendant's counsel of record:

> Matthew J. Rizzolo (D.C. 991577)
> Jonathan R. Ference-Burke (D.C. 1001179)
> ROPES & GRAY LLP
> 2099 Pennsylvania Avenue, NW
> Washington, DC 20006

*/s/ John B. Williams*
John B. Williams